EXHIBIT 1

STATE OF NEW YORK
PUBLIC EMPLOYMENT RELATIONS BOARD

RECEIVED

SEP 21 2016

LABOR RELATIONS

In the Matter of the Arbitration Between

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS and COMMUNITY SUPERVISION
(Five Points C.F.)

                                                         **OPINION**
             - and-                                  **and**
                                                           **AWARD**

NEW YORK STATE CORRECTIONAL OFFICERS
AND POLICE BENEVOLENT ASSOCIATION,
INC.

Grievant:    John Crance
                PERB Case No. D2015-0123

BEFORE: Arbitrator Timothy S. Taylor, Esq.

APPEARANCES:

        New York State Department of Corrections and Community Supervision
        By: Michele J. O'Gorman, Deputy Director, Bureau of Labor Relations

        NYSCOPBA
        By: W. James Schwan, Esq.

The Arbitrator was appointed in accordance with the procedures of the New

York State Public Employment Relations Board to hear and render a binding

determination in the above entitled arbitration between the State of New York

Department of Corrections and Community Supervision (hereinafter referred to as

"State" or "DOCCS") and the New York State Correctional Officers and Police

Benevolent Association (hereinafter referred to as "NYSCOPBA" or "Union")

1

CRANCE 000012

regarding Grievant, Correction Officer John Crance.  Pursuant to Article 8 of the

2009-2016 Collective Bargaining Agreement between the State of New York (State)

and NYSCOPBA ("the agreement" or "CBA" J.1)[1], Grievant was suspended without

pay effective November 30, 2015.  The Grievant was issued a Notice of Discipline

(NOD) dated December 3, 2015 and was later issued a corrected NOD dated

December 16, 2015.  As a result, Grievant's suspension date was changed to

December 12, 2015 (J.3).  The NOD seeks the Grievant's dismissal from service and

loss of any accrued annual leave.  Grievant filed a disciplinary grievance.  Hearings

were held at Auburn, New York on April 14, May 9, June 6, and June 7, 2016.  The

parties had a full and fair opportunity to present witnesses, cross-examine all

witnesses, and submit exhibits. All hearings were recorded and transcribed by Accurate

Court Reporting, Inc.  Copies of all transcripts were provided to the State, Grievant's

Counsel, and Arbitrator.  The parties agreed to enter into the record, transcribed testimony

from a separate, but related hearing involving specified witnesses. Briefs were received on

or about August 23, 2016.  As of that date, the hearing was deemed closed.

## DISCIPLINARY CHARGES

1. On September 18, 2015, while on duty as Transportation Officer at Five Points
   Correctional Facility, you used unnecessary physical force on an inmate, in
   violation of DOCCS Employees' Manual Sections 2.2, 9.1 and 9.2, and
   DOCCS Directive #4944: Use of Physical Force.  Specifically, immediately
   prior to your involvement with the transport of Inmate Carey Smith (10A1107)
   from Five Points CF to the Community Supervision Office in Brooklyn, you
   punched the inmate in the face while in the infirmary after you ordered the
   inmate to take a shower and the inmate refused.

---

[1] The exhibits are referenced as J. _ for Joint, S. _ for State, and U. _ for Union. The transcripts will be
referenced as T# _ p. _. The transcripts will be identified by number and page. Transcript #1 is April 14, 2016,
transcript #2 is April 21, 2016, transcript #3 is May 9, 2016, transcript #4 is June 2, 2016, transcript #5 is June 6,
2016, and transcript #6 is June 7, 2016.

2

2. On September 18, 2015, after using physical force on an inmate as noted in Charge #1, you failed to report the use of force, in violation of DOCCS Employees' Manual Sections 2.2 and 9.4, and DOCCS Directive #4944: Use of Physical Force. Specifically, after using physical force on inmate Carey Smith (10A1107) as noted in Charge #1, you failed to complete and submit to the Superintendent a "Use of Force Report" immediately following your use of physical force on said inmate.

3. On September 18, 2015, while involved with the transport of an inmate from Five Points CF to the Community Supervision Office in Brooklyn, you failed to discharge your duties and comport yourself so as to carry out the programs and policies of the Department, in violation of DOCCS Employees' Manual Sections 2.2, 2.23 and 7.9. Specifically, while transporting inmate Carey Smith (10A1107), you observed blood on inmate Smith's shirt at a rest area stop off of NY Highway 7 and did not report it to your supervisor, Sgt. J. Duda.

4. On September 18, 2015, while involved with the transport of an inmate from Five Points CF to the Community Supervision Office in Brooklyn, you failed to report an inmate injury, in violation of DOCCS Employees' Manual Sections 2.2, 2.23, 7.9 and 8.2. Specifically, you observed swelling under inmate Carey Smith's (10A1107) left eye shortly after arriving to the Community Supervision Office in Brooklyn and did not report it to your supervisor, Sgt. J. Duda.

5. On September 18, 2015, while at the Community Supervision Office in Brooklyn following the transport of inmate Carey Smith (10A1107), you provided false and misleading information to the Office of Special Investigations (OSI), in violation of DOCCS Employees' Manual Sections 2.2 and 4.16. Specifically, in a memorandum to OSI dated September 18, 2015, you stated that you did not observe any injuries to inmate Smith during his transport from Five Points CF to the Community Supervision Office in Brooklyn.

6. On October 7, 2015 at approximately 10:30 a.m., while being questioned by OSI staff at the State Office Building in Utica, New York, you provided false and misleading information, in violation of DOCCS Employees' Manual Sections 2.2 and 4.16. Specifically, during the examination:

   • You stated that inmate Carey Smith (10A1107) requested to shower prior to his transport from Five Points CF to the Community Supervision Office in Brooklyn and did so without incident.

3

• You stated that you did not use physical force on inmate Smith in the infirmary.

## RELEVANT CONTRACT PROVISIONS

Article 8 of the Collective Bargaining Agreement between the parties (J.1) in

pertinent part states:

### ARTICLE 8

### Discipline

8.1 Exclusive Procedure
Discipline shall be imposed upon employees otherwise subject to the revisions of Sections 75 and 76 of the Civil Service Law only pursuant to this Article, and the procedures and remedies herein provided shall apply in lieu of the procedure and remedies prescribed by such sections of the Civil Service Law which shall not apply to employees.

8.2 Disciplinary Procedure
(a) Discipline shall be imposed only for just cause...
(h) Disciplinary arbitrators shall confine themselves to determinations of guilt or innocence and the appropriateness of the proposed penalties, taking into account mitigating and extenuating circumstances. Disciplinary arbitrators shall neither add to, subtract from nor modify the provisions of this Agreement. The disciplinary arbitrator's decision with respect to guilt or innocence, penalty or probable cause for suspension pursuant to Section 8.4 of this Article, shall be final and binding upon the parties, and the disciplinary arbitrator may approve, disapprove or take other appropriate action warranted under the circumstances, including, but not limited to, ordering reinstatement for all or part of the period of suspension. If the disciplinary arbitrator, upon review, finds probable cause for the suspension, he may consider such suspension in determining the penalty to be imposed.

8.4 Suspension Before Notice of Discipline
(a) Prior to issuing a notice of discipline or the exhaustion of the disciplinary grievance procedure provided for in this Article, an employee may be suspended without pay by his appointing authority only pursuant to paragraphs (1) and (2) below.

(1) The appointing authority or his designee may suspend without pay an employee who the appointing authority or his designee determines that there is probable cause that such employee's continued presence on the job represents a potential danger to persons or property or would severely interfere with its operations. Such determination shall be reviewable by a

4

disciplinary arbitrator. A notice of discipline shall be served no later than seven days following any such suspension. At the time of suspension, the appointing authority or his designee shall set forth in writing to the employee the specific reasons for the suspension.

## RULE VIOLATIONS CITED

**DOCCS Employees' Manual:  (J-3)**

**Section 2.2** - An employee shall not knowingly or willingly violate any law or ordinance of the United States or the State of New York or any rule, regulation, or directive of the Department.  Any conduct, whether occurring on or off-duty, which constitutes an "offense" as defined in the penal law, or any conduct which alleges the possession and/or use of a controlled substance or marijuana, may be the basis for disciplinary action, regardless of whether an arrest, prosecution, or conviction occurred.

**Section 2.23** - Employees shall recognize that the Department protects society, not only by maintaining inmates in secure custody or under community supervision, but also by preparing as many inmates as possible for law abiding living when released. Every employee shall discharge his or her duties and comport himself or herself so as to carry out the programs and policies of the Department.

**Section 4.16** - Falsification of records: No employee shall knowingly make a false or inaccurate official report or statement, orally or in writing, or make, maintain, cause, or permit to be made a false or inaccurate record or false or inaccurate entry in official records or omit or fail to disclose pertinent facts.

**Section 7.9** - Employees shall cooperate in maintaining the security and good order of the facility and shall aid in the rehabilitation of inmates.  Each employee shall be responsible for the efficient performance of duties assigned, including the proper custody, supervision, and welfare of all inmates under his or her direction.



5

CRANCE 000016



**Section 9.4 -** Reports of use of physical force: In all instances where physical force is used on an inmate, a "Use of Force Report" will be submitted by the individual using such force to the Superintendent prior to the completion of the individual's tour of duty. The report will be completed as outlined in Directive #4944, "Use of Physical Force."

## ISSUES

1. Is the grievant guilty of the charges of the December 16, 2015, Notice of Discipline*?

6

2.  If guilty, is the proposed penalty of dismissal from State service and loss of all accrued annual leave an appropriate penalty?

3.  If the proposed penalty is not appropriate, what penalty, if any, is appropriate?

4.  Was there probable cause to suspend the Grievant on December 12, 2015 **?

   * The December 16, 2015, Notice of Discipline was issued as a correction to the initial December 3, 2015, Notice of Discipline.

   ** Grievant's date of suspension was changed from November 30, 2015, to December 12, 2015, based upon the Corrected Notice of Discipline.

## Factual Background

Grievant has been employed by DOCCS since June 6, 2005. He is currently assigned to the Five Points Correctional Facility. He has been at Five Points for over 10 years. He holds the bid position as a transportation officer. He has held that bid position for almost 6 years. As a transportation officer, he is responsible for transporting inmates when they need to go outside of the facility for any reason.

Inmate Carey Smith is a transgender inmate, who identifies as female, (for the purposes of this opinion inmate Smith will be referred to as a female). She is six feet and weighs 174 lbs. She has documented mental health issues. Inmate Smith had a history of filing complaints and allegations against staff, of which most were found to be unsubstantiated after thorough investigation by the OSI and/or the Five Points C.F.

On September 18, 2015, inmate Carey Smith was being released from the Five Points C. F. as an inmate and to be placed on parole. Due to inmate Smith's prior history of making allegations of staff misconduct, inmate Smith was to be transported by Five Points C. F. staff to the Brooklyn Community Supervision/Parole Office rather than by public transportation.

7

This trip was a special trip with additional designated security staff including a correction sergeant and three correction officers. A handheld video recorder was to record the inmate's entire transport from her removal from the facility cell until she was turned over to Community Supervision staff in Brooklyn (T#3 p. 53-54, J.6A p. 6). The staff assigned to this trip included Grievant, Officer Steven Mahunik, and Officer Kyle Kennedy under the supervision of Sergeant Joseph Duda. Sgt. Duda supervised the trip. Grievant was responsible for the inmate, Officer Kennedy was in charge of the video camera and Officer Mahunik was in charge of the paperwork (T#6, p. 17). Grievant and Officer Mahunik had been assigned to the duties of the transportation bid on a regular basis prior to this trip.

Inmate Smith was handcuffed and removed from her cell in #12 Building at approximately 7:30 a.m. on September 18, 2015 (S.11A). Grievant, Sgt. Duda and Officer Kennedy were present at that time (T# 6 p.18). A video camera being operated by Officer Kennedy recorded the inmate being removed from the cell. According to the Officers, inmate Smith had no visible injuries at that time (J.5 p. 8). When she was removed from her cell, she was dressed in a mental health smock.

Inmate Smith was escorted to the strip frisk room, which is also located in #12 Building. At some point during the removal of inmate Smith from the cell and moving her to the strip frisk area, Correction Officer Steven Mahunik arrived for the escort. Grievant performed the strip frisk without incident. Inmate Smith had no visible injuries at the conclusion of the strip frisk (J. 8 p. 8). After the strip frisk was completed, inmate Smith was escorted into the infirmary area.

While escorting the inmate to the infirmary, Officer Mahunik realized that the transport shackles, waist chain, and box had been left in #12 Building. While the inmate

8

showered, Officer Mahunik returned to that area to retrieve the items for the transport (T #6 p.26).

Upon entering the infirmary area, inmate Smith was taken into one of the infirmary rooms and, according to the inmate, she was ordered to shower by Grievant (S.4, S.6 p.16). Grievant testified that the inmate asked to shower. Officer Kennedy described the inmate as smelling rancid. Sgt. Duda said that she stunk. According to the statements given by inmate Smith, she did not want to shower and advised the staff of such. Watch Commander Lt. Marketos testified that prior approval was necessary for the inmate to shower, but he did not receive a request.

Grievant told Officer Kennedy to shut off the camera (J.6A p.16). Sgt. Duda approved the camera to be shut off (J.6A p. 16). Officer Kennedy testified to leaving the infirmary after inmate Smith entered the shower. Sgt. Duda testified in his Q. and A. (J.6A p.17) that he left the area after the inmate entered the shower.

According to various statements made by inmate Smith, prior to showering, Grievant told her to sit on the bed in the room and then, prior to removing the handcuffs, Grievant punched her in the face several times (S.6 p.18-19). Inmate Smith fell to the floor. Inmate Smith attempted to strike back in defense. However, soon after the punching she became disoriented. Grievant told inmate Smith to get up and to shower, and inmate Smith complied. After showering, inmate Smith changed into a white shirt and khaki pants.

Officer Mahunik reported to the infirmary with the transportation set-up prior to the inmate's shower so that inmate Smith could be shackled for the trip (J-7, pg. 7-8). Officer Mahunik testified during his Q. and A. (J.7 p. 10) that he returned to infirmary prior to the inmate taking a shower. He observed the inmate take a shower and get dressed afterward. He

9

stated that he got a good look at the inmate's face, and the inmate had no observable injuries. After the inmate had showered as ordered, Grievant shackled her in full restraints.

Officer Mahunik reported to the Administration Building to collect the transport documents for the transport.  The other staff escorted inmate Smith to the awaiting van that was outside the door of the infirmary.  Officer Kennedy set up the handheld camera on a tripod in the aisle in back of the van and inmate Smith was loaded into the transport van.  The inmate was seated in the first row of seats in the back of the van behind the wire mesh grate separating the front driver seat from the passenger seats in the back of the van.

Grievant began to drive the van to the sally port area but soon after had to return to the infirmary as inmate Smith had not reported to medical staff to obtain her medications (J.8, p. 15).  The van was then driven out of the sally port area around to the front of the facility where Officer Mahunik arrived with the transportation documentation.

Inmate Smith was in the front row, and the camera was located in the aisle at the end of row three. Officer Kennedy was seated in the third row seat.  The fourth row seat was vacant at this time.  Sgt. Duda remained in the front passenger seat while Grievant exited the front of the van and opened the side door so that Officer Mahunik could load the paperwork into the back of the van.

While sitting in the van in front of the Administration Building, inmate Smith became physically ill and vomited in the seat of the van (T#6 p. 43, S.6 p. 27).  Inmate Smith was removed from the soiled van and was placed into a different van. Officer Mahunik stated that he witnessed the inmate vomit and asked if she was all right.  According to Officer Mahunik, while the inmate was exiting from the van, she slipped in the vomit and fell between the seats and the doorframe.  She landed on her left side.  Grievant assisted her up. The Grievant

10

testified to using one arm to lift the inmate off of the floor of the van. Officer Mahunik asked if she was all right and the inmate said "yes." Officer Mahunik stated at his Q. and A. that he got a good look at inmate Smith's face and saw no injuries.

Grievant entered the facility and obtained the keys for a different van (T#6, p. 45). Staff entered the new van and the camera was set back into place. Inmate Smith was removed from the soiled van and was placed into the new van. Grievant drove away from the facility. At no time prior to departing the facility was inmate Smith seen or evaluated by medical staff. Lt. Marketos testified that had the inmate fallen in the van, medical should have been notified.

Approximately two and one half hours into the trip, Grievant pulled the van into a rest stop to use the restroom. Inmate Smith did not exit the van during this stop (T#6 p. 54). Grievant approached inmate Smith and realized that the inmate had a stain of some sort on her shirtsleeve. Grievant believed it to be vomit from the earlier incident. Inmate Smith informed Grievant that it was blood. Grievant assumed it was from the inmate's nose, which he determined, after visually inspecting her nose, did not appear to be bleeding at that time. Grievant did not report this to Sgt. Duda. At the rest stop, Officer Mahunik and Grievant switched their roles with Officer Mahunik driving and Grievant sitting in the farthest back seat of the van behind Officer Kennedy and the camera on the tripod.

The van arrived at the Brooklyn parole office at approximately 3:15 p.m. Staff exited the van with inmate Smith and entered the parole office. Parole Officer Najieb Isaac after entering the lobby area immediately saw the injury to inmate Smith's eye and the blood on her nose (T#2 p. 46-47). PO Isaac asked the correction staff what had happened to the inmate/parolee. Grievant responded that it had happened before they took custody of the inmate and that the inmate had seen medical and was treated and approved for transport. PO

11

Isaac did not believe this to be true. She did not believe that a nurse would leave the inmate untreated in the manner inmate Smith presented. Neither would a nurse approve for her to be transported with obvious untreated injuries (T#2 p. 42).

PO Isaac signed the body receipt, a form utilized by DOCCS when physical custody of an inmate is being turned over, taking full custody of inmate Smith. She was taken out of the lobby area and taken to PO Isaac's desk in the back of the parole office. PO Isaac talked to inmate Smith to ascertain how she had become injured. Inmate Smith appeared very fearful, nervous, and emotionally distraught at that time. After much hesitation, inmate Smith advised PO Isaac that the correction officers had abused her while being transported to Brooklyn (T#2 p. 91). Inmate Smith in a written statement (S. 3) taken on September 18, 2015 states, "The Officer Strenego brutally beat me..."

Soon after SPO Moses arrived at PO Isaac's cubicle (S. 8). SPO Moses immediately noticed that inmate Smith's eyes were red and swollen. He also observed bruising on the parolee's face and blood on her shirt. Inmate Smith appeared scared and visibly upset (T#3 p. 11). After the parole office staff convinced the inmate that she was safe and that the correction officers were not around, inmate Smith explained that the officers beat her up (T#3 p. 10-11). Less than 30 minutes after inmate Smith's arrival in the Brooklyn office, photographs were taken of the injuries (T#2 pg. 96). Acting Bureau Chief Rodney Smith was immediately notified, and the DOCCS OSI was notified so that an investigation could be completed. In Acting Bureau Chief Rodney Smith's memorandum (U. 1), he writes that "I asked Carey Smith what happened to his eye, and he explained that he was beat up in the van by one of the officers who transported him to the office."

12

On September 18, 2015, at approximately 6:00 p.m., while at New York Methodist

Hospital, OSI Investigator Troycie Celestine interviewed inmate Smith. That statement (S. 4)

reads:

On 9/18/2015, at 6:00P.M., Parolee Smith was interviewed at New York Methodist Hospital
in regards to his allegation of assault by Five Points Transport Officers. He stated that at
approximately 8:00A.M he was in C2-39 cell, when Officers took me out of my cell and
brought him in to the 12 building to be striped. He was strip frisk and given his parole clothing.
They (Officers) then took him to the infirmary. Once in the infirmary Officer Strenego told
him that he needed to take a shower. Parolee Smith stated that he felt uncomfortable, so he
told Officer Strenego that he didn't want to take a shower; he just want to leave the jail. Smith
indicated that he has a camera order, and Officer K. Kennedy was holding the camera. Smith
alleged that Strenego told Kennedy to turn the camera off. Smith stated this time he sat down
on the metal bed, and once the camera was off, Strenego began to beat him. He was then
beaten so bad that he took a shower. He was punched about 8 to 9 times in his face which
caused the injury to his left eye and gave him a bloody nose. Smith also stated that Officer
Kennedy, Nurse Stevens, a Sergeant, and an unknown officer was outside the room during
this incident. Parolee Smith stated that he was not assaulted while in transport to Brooklyn
Parole office. However, he did indicated that he was threatened by the officer not to file a
lawsuit about the beating. Smith stated that Officer K. Kennedy, Strenego, and two other
unknown officers transported him from Five Points to Brooklyn Parole Office.

On September 29, 2015, inmate Smith positively identified Grievant from a photo

array (S. 5) given by OSI Assistant Deputy Chief for OSI investigations Marcial Rosado (T #

1 p. 49-50). On October 27, 2015, Senior Investigator Troycie Celestine interviewed inmate

Smith in the presence of a court reporter who transcribed the testimony (S. 6). In that

interview, Inmate Smith stated that Grievant ordered her to shower. She felt uncomfortable

showering with Grievant and the other officers present because of prior sexually inappropriate

comments made by officers. Inmate Smith states that she said "no." After that "Strangio said

to Kennedy 'Turn the camera off'." Strangio told her to sit on the bed, so she sat on the bed,

and before she could say anything, "he started beating me" (S.6 p.18). "He was punching me

with his right arm in my left eye... he punched me all over my face." Inmate Smith stated

that she tried to fight back but that Grievant really just beat me. She stated "he kept punching

13

me in my face, and then finally I got up and I was dizzy." In her transcribed statement, inmate Smith states, " Well, when I got in the van-- I went in the parking lot, I was so sick from when he beat me up that I started throwing up blood; I started throwing up a lot of stuff in the back of the van-- in the front of the van." She does not describe any injuries as taking place in the van.

After an investigation was completed by the OSI, it was determined that Grievant did use unnecessary and unjustified use of physical force on inmate Smith on September 18, 2015 and that the transporting staff were not truthful in regard to the events leading to the injuries sustained by inmate Smith.  Charges were filed on December 3, 2015 and amended on December 16, 2015.  On December 18, 2015, the Union filed a grievance on behalf of the Grievant contesting the charges and the State's proposed penalty of dismissal.  The matter is now before this Arbitrator for his review and determination.

## POSITION OF THE PARTIES
### THE STATE'S POSITION

The State argues that it has met its burden of proof on all six charges preferred against the Grievant.  The State maintains that the Grievant is guilty of using unnecessary force on an inmate and failing to report such use of force.  The State contends that inmate Smith was under the care, custody, and control of Grievant and the other transporting staff during the entire period from cell removal at Five Point's C. F. to delivery at the Brooklyn Parole Office.

The State argues that inmate Smith had no visible injuries when she was removed from her cell, yet when she arrived at the Parole Office she had injuries to her eye, blood on

14

her shirt and blood coming out of her nose. According to the State, the inmate was clearly injured during the time she was under Grievant's supervision. The State stresses the fact that the inmate was to be video recorded the entire time, but the camera for some reason malfunctioned, depriving the State of valuable information.

The State insists that the use of force occurred in the infirmary and that Officer Kennedy, Officer Mahunik, and Sgt. Duda all took part in an attempted cover-up of the inappropriate use of force. The State contends that, contrary to the testimony of Grievant, the inmate did not request a shower. The State maintains that inmate Smith stated that the Grievant performed a strip frisk on her after removing her from the cell and then took her to the infirmary area. While en route to the infirmary, Grievant told inmate Smith that she was going to take a shower. Inmate Smith advised staff that she did not want to take a shower.

The State argues that the evidence does not support the Grievant's testimony that the inmate requested a shower en route to the infirmary. The State points to the testimony of the Grievant that the inmate was handcuffed, but not in the actual transportation restraints that inmates put on when preparing for transport. If, as alleged by the Grievant, the inmate were going from her cell to the frisk area through the infirmary and out the back door to the van for transport, then the inmate would have been placed in full restraints upon removal from her cell. The State argues that the Grievant intended all along to take the inmate to the infirmary and use the pretext of a shower to get the inmate in private, turn off the camera to prevent the abuse from being captured, and physically assault the inmate.

In support of its position that the use of force occurred in the infirmary, the State argues that the testimony and statements of Grievant, Officer Kennedy, Officer Mahunik, and Sgt. Duda are consistent about the initial movements of the inmate, but conflict at the point

15

where inmate Smith is placed in the infirmary room for a shower. The State points to the testimony of Lt. Marketos who testified that the inmate should not have been allowed to shower without prior approval. The inmate's statements and the statements of Sgt. Duda, and Officer Kennedy are consistent that Grievant told Officer Kennedy to turn off the camera. All staff except Grievant reported leaving the area while the inmate was preparing to shower or showering. The State asserts that the statements given by the staff members are riddled with inconsistencies and that each tells a different version of what happened in the infirmary. Officer Kennedy states that he left the area to go put property in the van. Sgt. Duda states that Officer Kennedy and Grievant were with the inmate when he left, but Officer Kennedy testified that he left the area and that when he returned the inmate's hair was wet, and he assumed that she had showered. Sgt. Duda states that Officer Kennedy was in the room when inmate Smith showered.

The State opines that the staff is being untruthful regarding the lack of visible injuries to the inmate after she showered. As further proof that the inmate was injured in the infirmary, the State points to the fact that the transportation staff avoided all contact with the medical staff. After showering, and being put in restraints, the inmate was taken from the infirmary through the infirmary end door and put into the van. As the van began to pull out to exit the compound, Grievant returned the van to the infirmary area, and staff exited the van to run in "to get the inmate medical envelope." The State suggests that the transport staff did not want inmate Smith taken to see medical staff prior to departure because of the injuries to her face.

The State further suggests that even after the inmate vomited in the van, she was not taken to see medical. The fact that Grievant went back into the facility and grabbed a set of

16

keys for a second vehicle demonstrates that he did not want inmate Smith seen by any other staff.

Watch Commander Lt. Marketos testified that he received a call from the transport staff reporting that the inmate had vomited, he was also advised that the inmate had refused medical. According to the State, the inmate was required to meet with the medical staff and sign a medical refusal form. The State relies on the testimony of Lt. Marketos to support its argument that the injuries did not happen in the van.

Lt. Marketos testified that staff failed to report that the inmate fell in the van, and if he had been told, he would have ordered a medical evaluation. The State opines that the reason the staff did not notify Lt. Marketos is that they did not want the inmate seen by medical staff due to the injuries suffered in the infirmary. According to the State, the hasty exit is evidence of the transport staff's attempt to cover-up the inmate's injuries.

The State avers that the injuries to the inmate did not take place in the van. In support of this position, the State points to the inconsistent statements of the staff. Officer Mahunik states that the inmate fell on her side, while Grievant testified that the inmate fell flat on her face. Yet, no staff reported that the inmate fell, and no staff reported seeing any injuries to the inmate.

The State also contends that the aisle of the first van used for the transport was not wide enough for the inmate to fall face flat on the floor. Inmate Smith is 6 feet in height and at the time of the incident weighed 174 lbs. At the hearing, Investigator Retrosi, who is 5 feet 4 inches tall, demonstrated that he could not lie face down on the floor of the van without contorting his body and lifting his feet to a 90-degree angle. Moreover, the State observes that had the inmate slipped on her vomit and fallen in the van, there would have been vomit

17

on her pants. Yet, no transport staff or staff at the Parole office in Brooklyn ever reported seeing or smelling vomit. The State maintains that the Grievant's testimony that he lifted the inmate, who was in full restraints; off of the floor one handed to a standing position is unbelievable.

The State concludes that the Grievant's and staffs' testimony and statements in regard to inmate Smith's alleged slip and fall are not believable and not physically possible given the size of inmate Smith. The State points out that the Grievant, in denying any wrongdoing, testified that he believes that staff in the Brooklyn Parole Office caused the injuries. The State contends that this is Grievant's last attempt to shift responsibility away from him.

On the issue of inmate Smith's credibility, the State argues that although the inmate suffers from mental illness, she is able to recall the events of September 18, 2015. The State concedes that inmate Smith is unable to recall specific facts regarding the day Grievant punched her. However, the State attributes some of the confusing statements that the inmate made upon arriving at the Brooklyn Parole Office to the inmate's need for medication and food. After receiving food and medication, the inmate was able to calm down and articulate the details of the incident.

The inmate's statement that the abuse took place while being transported is not inconsistent with the incident happening at Five Points C.F. Inmate Smith's statement to the Acting Bureau Chief that the abuse happened while in the van on the way to Brooklyn can be explained as a misinterpretation of the inmate either saying that it was one of the officers in the van, or it happened on the way. The State argues that the inmate's more definitive statement is the one given to the OSI investigator.

18

According to the State, the inmate has been consistent in her allegations that the Grievant, while in the infirmary at Five Points C. F., repeatedly punched her in the face. The State points to the remarkable number of consistencies in the inmate's statement. The State asserts that the inmate's statement is more consistent with the statements and testimony of other staff than is the testimony of the Grievant. The State maintains that the four transport staff members never explained how the injuries occurred and never saw any injuries on the inmate.

The State contends that since all of the transporting staff denies any physical force was used on inmate Smith, they all admit that there was no reporting of physical force as required by DOCCS. Thus Grievant, the State concludes, is guilty of not reporting his use of physical force on inmate Smith.

The State further contends that the Grievant is guilty of not reporting blood and visible injuries. The State maintains that DOCCS employees are mandated to report inmate illness or injuries citing DOCCS Employees' Manual, Section 8.2 (J.3). The State argues that the Grievant admitted noticing blood on inmate Smith's shirt while at the rest stop en route to Brooklyn. Grievant also admits that he did not report the blood to Sgt. Duda. The State argues that the photograph of the inmate's shirt (S.2A) proves that the stain was blood.

Even though the Grievant observed puffiness under the inmate's eye while at the parole office, he failed to report the puffiness. The State argues that the photographs taken within minutes of the inmate's arrival at the parole office are clear evidence that the injuries were noticeable and should have been reported. The State insists that the Grievant did not report the injuries because he did not want his use of force on her discovered. He hoped to drop off the inmate in Brooklyn and be free of any responsibility.

19

The State also contends that the Grievant is guilty of providing inaccurate or false documentation. The State maintains that OSI Assistant Deputy Chief Rosado ordered Grievant to give a statement on September 18, 2015. The Grievant provided a statement denying that he saw any injuries to inmate Smith during the transport from Five Points C. F. to the Brooklyn Parole Office. The State avers that this is a false and misleading statement. The State argues that the Grievant made numerous false and misleading statements during his Q. and A. with DOCCS OSI. The State maintains that the Grievant provided false information when he stated that the inmate requested a shower and when he stated that he did not cause injury to the inmate.

In conclusion, the State argues that while inmate Smith's credibility might be questioned, the evidence introduced and testimony and statements of other individuals support inmate Smith's allegations. The State argues that the inmate did not report the incident. Instead, it was the parole office staff that reported the injuries. The inmate, despite her prior false accusations, did not make these allegations.

As for the penalty, the State insists that the Grievant must be terminated. According to the State, the Grievant's actions violate the policies and missions of the Department.

The State points to the Grievant's prior disciplinary record, having been found guilty of using excessive force. The State also insists on termination because of the impact that the Grievant's actions has on the safe operations of the Facility. According to the State, Grievant is a threat to the inmates in the correctional environment and also a threat to the operation of DOCCS.

20

## THE UNION'S POSITION

The Union argues that the State has failed to meet its burden of proof. The Union suggests that the appropriate standard is the clear and convincing evidence standard because the State is seeking termination. However, even under the preponderance of the evidence standard, the State has failed to meet its burden of proof. The State's failure is largely attributed to the conflicting and contradictory accounts of inmate Smith. The Union contends that no other witness corroborated the statements of inmate Smith.

The Union points to the various inconsistencies inmate Smith made in her various statements and the fact that inmate Smith was not called as a witness. The failure of the State to call inmate Smith as a witness deprived the Grievant of the opportunity to cross-examine her.

The Union argues that the inmate has given conflicting accounts of where the purported assault occurred, when it occurred, and the reason it occurred. The Union maintains that in the inmate's September 18, 2015 statement she claims that she was assaulted because of her "law suite packet" and because she was being monitored as a transgender woman (S.3). However, in the report of interview dated September 18, 2015, inmate Smith claims that she was assaulted because she did not want to take a shower (S.4).

The Union asserts that inmate Smith has also given different accounts of where the purported assault took place. In the report of interview, the assault is alleged to have taken place with the medical unit at Five Points C. F. In the memorandum prepared by Bureau Chief Rodney Smith, Ms. Smith "explained that he was beat up in the van." In the recorded testimony of Ms. Smith on September 29, 2015, she claims that the assault took place in the

21

infirmary. In the report of interview of Najieb Isaac, it is stated that the purported assault was understood by Ms. Isaac to have occurred "on the way here."

The Union argues that even the circumstances of the purported assault were not consistent. It contends that inmate Smith has claimed that she was beaten while seated on a metal bed and punched 8 or 9 times in the face by Officer Strangio. She has claimed that Officer Kennedy, Nurse Stevens, a sergeant, and an unknown officer were present during the alleged beating. In her statement of October 27, 2015, the inmate claims that Officer Strangio punched her all over her face and that she twice hit the officer.

The inmate has claimed that Nurse Stevens witnessed the assault and was laughing. The inmate has claimed that when she was taken outside to the van an officer told Officer Strangio to kill her. In all, the inmate claimed that three officers said that they wanted to "kill me." The Union points out that the inmate, in her September 29, 2015 interview, stated that on an earlier occasion she was taken out of Auburn Correctional Facility and forced to stand outside the building naked in front of ten officers.

The Union further maintains that the State failed to call a single individual who could corroborate any aspect of inmate Smith's stories. The inmate claimed that inmate porters, an inmate in an adjoining room, and a nurse were present at the time of the incident. Yet none were called as witnesses. The Union also contends that there was no medical examination of inmate Smith that establishes the time or cause of the inmate's injuries.

The Union contrasts the State's failure with the strength of the Union's case. The Union asserts that the Grievant testified and answered all questions forthrightly. According to the Union, the Grievant's testimony effectively rebutted the State's claim. The Union maintains that the camera's malfunction was not known to any of the transport staff. Problems with the

22

camera were known to Sgt. Duda and the Watch Commander, but not to the other officers. The Union stresses that nothing happened in the infirmary. According to the Union, the inmate was removed from her cell, strip frisked, and while being escorted through the infirmary, she asked to get cleaned up. The inmate showered, got dressed, and was placed into restraints. The transport officers then escorted her to the van.

After getting in the van, the inmate vomited in the front seat. The inmate while in full restraints, attempted to move out the front seat and, while exiting the van, slipped and fell in the van. The inmate landed on her face and possibly struck her face on the hard surfaces of the van while falling. The Union maintains that any injuries to inmate Smith must necessarily have happened in the van before leaving the facility. However, the transport staff observed none of the inmate's injuries because the injuries were too fresh, or no officer actually got a good look at the inmate's face. Furthermore, the Union argues, the inmate declined to see medical, even after being offered the opportunity by the transport staff and specifically by the Grievant.

The Union makes the points that none of the transport officers had any adverse history with inmate Smith. Sgt. Duda did not even know any of the other transport officers and has no reason to cover-up for Grievant. The transport staff reported the inmate's fall in the van to the Parole Office representatives.

The State failed to prove that the Grievant actually observed any injury to inmate Smith when in the van. The only conversation between the Grievant and inmate Smith took place during the rest stop. The inmate never turned her head and never left her seat. Whatever Grievant saw on the inmate's shirt, he believed it to be vomit. His belief was reasonable because by all accounts the inmate had vomited in the van.

Finally, the Union argues that any reporting duties rested with Sgt. Duda, not Grievant. In

23

conclusion, the Union insists that the Notice of Discipline must be dismissed, and the Grievant made whole.

## OPINION

The State has the burden of proof. The first set of findings the Arbitrator must make concerns whether the State met its burden of proving the charges set forth in the NOD (J. 2). The State must prove by a preponderance of the credible evidence that Grievant is guilty of the charges. If this standard of proof is met, the issue of penalty will be addressed.

The State has proven by a preponderance of the credible evidence that the Grievant is guilty of charge no. 1. The undisputed facts are as follows; inmate Smith had no visible injuries on September 18, 2015 at 7:30 a.m. Immediately upon arrival at the Brooklyn parole office at 3:15 p.m., inmate Smith had visible injuries to her eye, blood on her shirt, and blood coming out of her nose. Inmate Smith was under the care, custody, and control of Grievant and the transporting staff during the entire time from Five Points C. F. to the Brooklyn Office. The supervisors at Five Points had ordered that inmate Smith's transport be recorded on video. This did not happen.

The preponderance of the credible evidence supports a finding that Grievant punched inmate Smith while they were in the infirmary. It is more likely than not that Grievant, while with inmate Smith, did punch the inmate. The inmate's statements identify Grievant as the officer who struck her in the face. Although she identified him as Officer Strenego, she picked Grievant out of a photo array as the same officer who punched her in the face. The spelling of "Strenego" is not consistent in the various witness statements. The inmate clearly identified the Grievant from a photo array (S.5).

The photographs taken at the Brooklyn Parole Office (S.2A) reveal the image of the inmate with clear injuries to her eye and area around her eye. The left eye itself is red and bloody with significant bruising under and around the eye. The skin appears swollen and puffy. Her nose is

24

swollen, and the left nostril is cut and bleeding. Her bottom lip is red and discolored. These injuries are consistent with the inmate's written statements wherein she states that Grievant punched her in the face several times. The inmate's written statements are consistent with the other evidence.

The testimony of Officer Kennedy puts the Grievant alone with the inmate at the same time and place that the inmate claims that she was struck by the Grievant. Grievant is the only officer or DOCCS staff member to be with the inmate from her cell removal to her delivery to the Brooklyn Parole Office. The Union argues that there were two possible locations that the incident could have happened. One was the infirmary, and the other was the van. The Union argues that the evidence does not support the infirmary story.

The evidence does not support the explanation that the inmate injured herself while in the van. It is extremely unlikely that inmate Smith's injuries happened in the van. There simply is not enough room in the van for a person, the size of the inmate, to fall face down suffering the kind of injuries depicted in the photographs. The space in the van where the Union maintains the inmate fell and was injured is only 12-18 inches wide. The seats are padded. In order for the inmate to have fallen and injure herself, she would have had to be wedged into such a tight area.

The Union points to the failure of the State to call the inmate as a witness and also the inconsistent statements that the inmate gave as reasons that the State has failed to prove its case. I find that the State's failure to call the inmate and the inmate's erroneous declarations in her statements do not negate the fact that strong evidence supports the inmate's statements. Her statements consistently identify Grievant as the officer who punched her. The photographs of the inmate's face and clothing, the lack of any other plausible explanation, the fact Grievant, Officer Kennedy, Officer Mahunik, and Sgt. Duda agreed that the inmate vomited in the van and fell, but

25

CRANCE 000036

no injury was reported, and the inmate's positive identification of the Grievant out of a photo array all support the State's case.

Officer Kennedy was with the inmate the entire time except for the period that Grievant took direct supervision of the inmate and ordered her to take a shower. From this moment until the inmate was finished being shackled, only Grievant maintained control over the inmate. Sgt. Duda left the area while the inmate showered. Officer Mahunik's Q. and A. (J.7) is troubling. In it he states that he witnessed the inmate take a shower, saw her face after she exited the shower, but saw no injuries. He also states that he saw the inmate fall in the van, saw her face, but saw no injuries. I do not credit Officer Mahunik's statements. His complete denial flies in the face of the evidence that the injuries occurred either in the infirmary or in the van.

The inmate in her statements, taken 30 minutes after arriving at the Brooklyn Parole Office, described being beaten by the officers during her transport. She describes being hit in the face. The person who she describes as hitting her is Grievant.

On September 18, 2015, the inmate tells PO Isaac and SPO Moses that it was Grievant and that it happened while she was in the infirmary. She states that Grievant hit her several times. Inmate Smith told investigator Rosado that she was handcuffed and told to sit on the bed. According to her statement, Grievant punched her multiple times. I find that the State has proven that Grievant did punch inmate Smith.

Grievant, Officer Kennedy, and Officer Mahunik during his Q. and A., all testified that after moving inmate Smith from the infirmary to the transport van, the inmate vomited in the van. Vomiting is a common side effect of head trauma. It is reasonable to draw the inference that the punch or punches to the inmate's head caused the vomiting. Since the vomiting took place soon after the inmate was placed in the van, the punch would have had to take place while the inmate was

26

in the infirmary. Officer Kennedy testified that the only officer alone with inmate Smith at the infirmary was Grievant.

The Union maintains that the injuries to the inmate were caused when the inmate slipped in her vomit and fell in the van. However, the credible evidence indicates that the injury happened prior to the inmate slipping on vomit in the van. The injuries in the photographs are not consistent with the testimony describing the fall in the van. The testimony is that the inmate vomited in the van's front seat, got up to exit the van, slipped and went down. A van identical to the one used to transport the inmate was brought to the hearing for examination. After examining the van, I find it impossible for a person the same height and weight as inmate Smith to have fallen face down in the prone position in the transport van. There was not enough room in the van for inmate Smith to fall and strike her face repeatedly before coming to rest on the floor of the van. It is much more likely that the inmate's injuries were caused prior to her entering the van. It is more likely than not that the vomiting was caused by a blow to the inmate's head in the infirmary rather than that the injuries to the inmates face were caused by a fall in the van. Officers Mahunik and Kennedy were both absent from the infirmary for some period of time while Grievant with inmate Smith. Sgt. Duda also was absent at the same time. Conveniently these absences occur when the camera was off, and the inmate was showering.

Officer Kennedy testified that he was not with the inmate at two points during the trip. One was when inmate Smith was in the shower, and the other was when he went to the restroom at the rest stop. Officer Kennedy testified that he never saw Grievant punch inmate Smith. If Officer Kennedy is to be believed, then Grievant was left alone with inmate Smith in the shower area. Grievant would have had an opportunity to punch the inmate in the shower area.

27

Grievant admits to being alone with inmate Smith. Whether Grievant punched inmate Smith while alone or with others present does not negate the claim by inmate Smith that she was punched by Grievant. The fact that Officer Kennedy testified to not being present is either true or his attempt to cover up for Grievant.

The evidence in this case clearly establishes that Grievant was in charge of the inmate. Grievant testified that while the inmate was taking a shower Officer Kennedy got the property, secured it in the van, and Sgt. Duda had to go get the paperwork or use the restroom, and he stayed there and observed the inmate (Transcript # 6 p. 35). Sgt. Duda in (J.6A p.17) states that he left the shower area to go to the bathroom. Officer Mahunik had left earlier to get the chains. Officer Mahunik was back with the chains and restraints by the time the shower was done.

I find that the inmate's injuries took place in the infirmary at the Five Points C. F. I find that Grievant was in charge of the inmate while the inmate was in the infirmary. I find that Grievant punched the inmate after he ordered the inmate to take a shower, and the inmate refused. The Grievant's actions violate DOCCS Employee Manual Sections 2.2, 9.1 and 9.2 and DOCCS Directive # 4944 Use of Physical Force.

I find Grievant guilty of charge no. 2. DOCCS Employees' Manual Section 2.2 and 9.4, and DOCCS Directive # 4944 Use of Force require that an officer report the use of force. Grievant, after punching inmate, Smith failed to complete and submit to the Superintendent a "use of force report" immediately following his use of physical force on inmate Smith. Grievant denies using physical force on inmate Smith and, if true, he would have no obligation to complete a use of force report. However, I am convinced Grievant punched the inmate in the infirmary. After using physical force, he was obligated to comply with DOCCS

28

rules and regulations and policies. He failed to do so. I find the Grievant is guilty of charge no. 2.

Charge no. 3 alleges that the Grievant failed to report observing blood on inmate Smith's shirt at the rest area stop off of NY Highway 7 and did not report it to his supervisor Sgt. J. Duda in violation of Employees' Manual Sections 2.2, 2.23, 7.9. The Grievant admitted that he noticed what inmate Smith identified to him as blood on the inmate's shirt while at a rest area stop. Grievant did not report the blood on the inmate's shirt to Sgt. Duda. Grievant's defense is that he did not believe that it was blood at that time. The photograph of the inmate (S-2A) clearly shows a stain on the inmate's shirtsleeve that looks like blood. Given the fact that the Grievant allegedly watched the inmate fall in the van, it is puzzling that he did not check the inmate for signs of an injury during the 5-6 hour trip to Brooklyn. It is even more puzzling that Grievant failed to check on the inmate's well-being after seeing the stain on her shirt. I find that the Grievant is guilty of charge no. 3.

Charge no. 4 alleges that Grievant failed to report an injury to the inmate in violation of DOCCS Employees' Manual 2.2, 2.23, 7.9 and 8.2. The State alleges that Grievant, while at the Community Supervision Office in Brooklyn, observed swelling under the inmate's left eye shortly after arriving to the office and did not report it to Sgt. Duda.

Grievant admitted to seeing the swelling under inmate Smith's eye, but thought that the swelling was due to the inmate sleeping. I find that the Grievant failed to report the swelling because Grievant knew that he had punched inmate Smith and was trying to cover up his actions by not filing any paperwork. Grievant is guilty of charge no. 4.

Charge no. 5 alleges that Grievant provided false and misleading information to the Office of Special Investigation in violation of DOCCS Employees' Manual Section 2.2 and

29

4.16. The Grievant is alleged to have stated in a memorandum that he did not observe any injuries to inmate Smith during his transport from Five Points C. F. to the Community Supervision Office in Brooklyn.

In Grievant's memorandum dated September 18, 2016, he denies observing any injuries. I find that the memorandum contains false and misleading information. Clearly Grievant did not admit his misconduct, nor did he report any injuries to inmate Smith. Grievant is guilty of charge no. 5.

Charge no. 6 alleges that on October 7, 2015, the Grievant provided false and misleading information in violation of DOCCS Employees' Manual Section 2.2 and 4.16. Specifically, Grievant is alleged to have stated that inmate Smith requested a shower and showered without incident prior to his transport from Five Points Correctional Facility to the Community Supervision Office in Brooklyn. Also, charge no. 6 alleges that Grievant stated that he did not use physical force on inmate Smith in the infirmary.

I find that the Grievant is guilty of charge no. 6. Grievant's statements to the OSI staff were false and misleading. The inmate did not request a shower, and there was an incident. The inmate was punched in the face before the inmate showered. The Grievant made a false and misleading statement when he denied punching the inmate in the face. Grievant is guilty of charge no. 6.

## PENALTY

Having found the Grievant guilty of charges 1, 2, 3, 4, 5, and 6, I must determine whether termination is the appropriate penalty. The nature of the offenses committed, as well as, Grievant's length of employment, performance evaluations, and prior disciplinary history are relevant to any penalty imposed. The Grievant's recognition of misconduct, remorse, if

30

any, and efforts at rehabilitation are mitigating factors in assessing any penalty. Grievant has

been employed by DOCCS since June 6, 2005. He is currently assigned to the Five Points

Correctional Facility. He has been at Five Points for over 10 years. The Union did not enter

into the record Grievant's performance evaluations.

The Grievant has been subject to a prior disciplinary action. In 2009, Arbitrator Jay

Siegel, Esq. found Grievant guilty of using inappropriate force on an inmate. (S.17)

The Arbitrator found Grievant's conduct to be inappropriate, but not so egregious as to

warrant a lengthy suspension without pay. Mitigating factors in that matter were that the

Grievant did not lie, nor did the Grievant pummel the inmate with the intent to injure. Also,

the Grievant did not cause grievous injury. Arbitrator Siegel imposed a penalty of a 3-week

suspension without pay, stating, "This will give him ample opportunity to re-assess his use of

force and training on the use of force."

The findings in this case differ in material ways from those in the Grievant's prior

disciplinary action. In the prior case the Grievant's use of force was not found to be

egregious. Neither was the Grievant found guilty of providing a false or misleading statement.

Lastly, Arbitrator Siegel found that the Grievant did not intend to injure the inmate.

In this proceeding, the Grievant's actions are egregious. To punch an inmate without

any justification is intolerable. Not providing medical treatment to an injured inmate is

extremely callous. The Grievant here has been found guilty of providing false and misleading

statements. The Grievant's statements deny any wrongdoing or that the punch ever happened.

The Grievant's intent to injure the inmate is established by the severity of the injuries and his

attempt to cover up the incident. Furthermore, the fact that the inmate was denied medical

assistance, even after vomiting in the van, shows a callous disregard for the care and well-

31

being of the inmate evidencing deliberate indifference. The vomiting was most likely the result of the inmate suffering head trauma from the punches delivered by Grievant.

The Grievant does not admit to punching the inmate. Instead Grievant suggests that the inmate fell in the van or was injured at the parole office. He has taken no responsibility for what he did to the inmate. Nor does he take responsibility for involving the other officers and subjecting them to possible disciplinary charges. He most likely orchestrated the cover up. He did not learn from his prior discipline, and it is unlikely that his behavior will change even if given a lengthy suspension.

The State's proposed penalty is based on a reasonable assessment of the severity of the penalty compared to the seriousness of the offense. Indeed, the penalty must fit the offense. The State's proposed penalty is not unreasonable, arbitrary, or capricious. Based on the foregoing, the Arbitrator finds that dismissal from service is an appropriate penalty.

Finally, the Arbitrator finds that the State had probable cause to suspend the Grievant. At the time the State filed charges against the Grievant, it had credible evidence that the Grievant had punched the inmate in the face and had made false and misleading statements. Under these circumstances, it was not unreasonable for the State to conclude that the Grievant's continued presence on the job could severely interfere with its operations.

Accordingly, and based on the foregoing, the Arbitrator finds and makes the following:

32

## AWARD

1. The Grievant is guilty of charges 1, 2, 3, 4, 5, and 6 as set forth in the December 16, 2015 Notice of Discipline.

2. The penalty of dismissal from service and loss of any accrued annual leave is an appropriate penalty.

3. The State had probable cause to suspend the Grievant on December 12, 2015.

4. The Arbitrator shall retain jurisdiction to address any and all question that may arise regarding the State's implementation of the penalty.

Dated: September 21, 2016

     Albany, New York

                          *Timothy S. Taylor*
                      TIMOTHY S. TAYLOR, ESQ.
                         ARBITRATOR

### AFFIRMATION

STATE OF NEW YORK)
COUNTY OF ALBANY) ss.:

I, Timothy S. Taylor, do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

Dated: September 21, 2016
     Albany, New York       *Timothy S. Taylor*
                      TIMOTHY S. TAYLOR, ESQ.
                       ARBITRATOR

33

CRANCE 000044