EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF NEW YORK

 3   _____

 4   CAREY SMITH,                    No.:

 5         Plaintiff,               18-CV-6658(MAV)(MJP)

 6      -against-

 7   NEW YORK STATE CORRECTIONS OFFICER

 8   ("CO") KYLE KENNEDY; CO JOHN CRANCE;

 9   SGT. SGT. JOSEPH DUDA; and CO STEVE

10   MAHUNIK, in their individual

11   capacities,

12          Defendants.

13   _____

14              VIDEOTAPED DEPOSITION

15   _____

16

17   WITNESS:             C.O. JOHN CRANCE

18   DATE:                Friday, March 28, 2025

19   START TIME:          11:02 a.m., ET

20   END TIME:            3:56 p.m., ET

21   REMOTE LOCATION:     Remote Legal platform

22   PROCEEDINGS OFFICER: Ashby Everhart, CER-16-15

23   JOB NO.:             34068

24

25
```

1    the same seat?

2         A    Yes, sir.

3         Q    Okay.  And did both vans have the same type of

4    seating configuration?

5         A    Yes.  The only difference in the vans is

6    sometimes they're little -- one's a little longer than

7    the other.  So they have the same exact layout and

8    everything.  There might be an extra seat.

9         Q    And by actual seat you mean an actual row of

10   seats?

11        A    Actual row.  Yes, sir.  Yes, sir.

12        Q    Do you know the make and model of either of

13   the two vans?

14        A    I do not know what -- I know we use Chevys and

15   Dodges.  I -- I don't know which one we had.

16        Q    Okay.  In the -- in the second van, was the

17   tripod placed in the same location as in the first van?

18        A    I believe so.

19        Q    Do you know if Ms. Smith vomited on her bag of

20   lunch?

21        A    I don't recall.

22        Q    Okay.  What happened after Ms. Smith was

23   loaded into the second van?

24        A    Well, we were short on time because we had to

25   be in New York City at a certain time.  So I know we got

```
 1   everything loaded, transferred from one van to the

 2   other, and then we headed out because we had a timeframe

 3   before --

 4        Q    And --

 5        A    Yeah.

 6        Q    Yeah.  Go ahead.

 7        A    Before the parole officers got out of work, so

 8   we had to be up there.

 9        Q    There you go.  You answered my next question

10   before I asked it.

11        A    Okay.

12        Q    So you had to be in New York City by a certain

13   time of day before the parole office closed, right?

14        A    Yes, sir.

15        Q    Okay.  And do you (indiscernible - audio

16   disruption) if you didn't get there by the time the

17   parole office closed?

18        A    You broke up there for a second.  I didn't

19   hear half your question.

20        Q    Okay.  To your understanding, what would have

21   happened if you didn't get to the Brooklyn Parole office

22   by the time it closed?

23        A    Oh, we didn't have a -- I have no idea.  I

24   mean, we didn't have -- we had to be there before a

25   certain time, that's why we headed out as fast as we
```

1    throughway stop or expressway stop.  They -- they have

2    facilities and snack machines and trash buckets and

3    stuff.

4        Q    During that first part of the trip before the

5    rest stop, what was the -- what was the mood like in the

6    van?

7        A    It was quiet.  The whole -- the whole trip was

8    quiet.  We didn't have any issues.

9        Q    Did Ms. Smith say anything?

10       A    No.  Not -- hardly anything at all that I

11   remember.

12       Q    Did anything unusual happen during that part

13   of the trip?

14       A    No.  She slept most of the way.

15       Q    Okay.  What about you?  Did you have any

16   conversation with anybody?

17       A    No.  Not -- not anything significant.

18       Q    Okay.  Did you, like, listen to the radio or

19   anything?

20       A    Yeah.  The radio was on.

21       Q    It -- was it your, you know, standard practice

22   to listen to the radio when you're transporting inmates?

23       A    Yeah.  Yeah.  The officers up front, yeah,

24   would listen to the radio usually.

25       Q    Okay.  Did you have any conversation with

```
 1        A    It was on --

 2        Q    -- did you notice the spot?  Yeah.

 3        A    I believe it was her -- would have been her

 4   right cuff, the white cuff of her white shirt.

 5        Q    Okay.  On her --

 6        A    Wrist.

 7        Q    Near her right wrist?

 8        A    Yes.  I believe it was the right side.  Yes.

 9        Q    And how big was this spot?

10        A    It was about an inch, half inch to an inch

11   long.  It was like a line, a straight line.

12        Q    And where was she when you noticed this spot?

13        A    She was sitting in the seat.  She never got

14   out of the van.  She was still in the same seat.

15        Q    Okay.  Did it smell like vomit?

16        A    I didn't -- I didn't smell the vomit at this

17   point.

18        Q    Well, after transferring to the second van, at

19   any point on September 18, 2015, did you smell vomit

20   again?

21        A    I don't recall smelling any.

22        Q    And after you noticed this spot, did you say

23   anything to Ms. Smith?

24        A    Just asked her what it was, and she said she -

25   - she -- it came from her nose.
```

```
1      Q    Did you tell anybody about the brown spot on

2   Ms. Smith's clothing?

3      A    I -- I don't recall saying anything.  No.

4      Q    So you didn't say anything to anybody else

5   about it?

6      A    I -- I don't -- I didn't think it was very

7   significant.  It wasn't a major blood loss or nothing or

8   any more vomit, so I didn't think much of it.

9      Q    When she said it came from her nose, did you

10  take a look at her nose?

11     A    I looked at her face, and I didn't see

12  anything.

13     Q    And you didn't question her after that --

14     A    No, sir.

15     Q    -- about her nose?

16     A    No, sir.

17     Q    At some point, did you come to find out that

18  the camera stopped working?

19     A    I believe it was either right at the -- that

20  area or just after I heard -- I heard something about

21  the camera has failed, it's not working.

22     Q    How did you find out?

23     A    I -- I don't know if I heard -- I might have

24  heard -- I don't know if Kennedy told me or he was

25  telling the sergeant, and I overheard it.
```

1    passenger seat?

2        A    Yeah.  He -- he traveled in the passenger seat

3    the whole entire trip.

4        Q    How long was the entire drive from Five Points

5    to Brooklyn in terms of time?

6        A    It takes at least five hours to get to New

7    York City from Romulus, so somewhere around five, six

8    hours.

9        Q    During the second part of the trip, did Ms.

10   Smith say anything?

11       A    No.  It's -- not that -- not that I know of,

12   sir.

13       Q    Okay.  Did anybody say anything to her?

14       A    Not that I know of.

15       Q    You were keeping an eye on her generally --

16       A    Oh, absolutely.

17       Q    -- right?

18       A    I was sitting in the back.  I watched what --

19   just -- she just sat there with her head against the --

20   the gate.  The side window panel, there's a metal gate

21   there inside the van, just rode sleeping with her head

22   against the van or against that gate.

23       Q    Is there anything that sticks out at all about

24   the second part of the trip?

25       A    No, sir.  It was uneventful.

1     Q     Okay.  Did you see that at any point on

2     September 18, 2015?

3     A     Not while the inmate was in my custody.  No.

4     I did not.

5     Q     And what would have -- and what would -- what

6     did DOCCS require you to do if you did see the stain on

7     her shirt?

8     A     That would make it so I had to get medical

9     attention for this inmate.

10           MR. FU:  Regina, we can take down this

11    exhibit.

12    BY MR. FU:

13    Q     On the date of the incident, did you see

14    anybody use force on Ms. Smith?

15    A     No, sir.  I did not.

16    Q     At any point from the time that you got her

17    out of the cell to the time that you turned her over to

18    Brooklyn Parole, was there any reason at all to use

19    force on Ms. Smith?

20    A     No, sir.

21    Q     And why is that?

22    A     She didn't cause any problems.  She was

23    compliant the whole time.

24    Q     And prior to September 18, 2015, did you

25    receive training from DOCCS about use of force?

1      A    I don't understand.

2      Q    Sure.  Are you aware that this lawsuit is

3    independent of your arbitration?

4      A    Yeah.  It's separate.  Yes.

5      Q    Are you aware that you're being sued for money

6    damages?

7      A    Yes.

8      Q    Okay.  And you're aware that Ms. Smith is

9    accusing you of punching her in the face on September

10   18, 2015?

11     A    That's what -- that's what Timothy reported.

12   Yes, sir.

13     Q    Okay.  Well, what do you think happened to Ms.

14   Smith on September 18, 2015?

15     A    I have no idea, sir.

16     Q    Okay.  You don't have any theories as to how

17   she ended up in the condition that is depicted in those

18   photographs we just saw?

19     A    No, sir.

20     Q    No idea at all?

21     A    I have no idea, sir.

22     Q    Okay.  Have you ever heard of the word

23   indemnification?

24     A    Yes, sir.

25     Q    Okay.  And what does that mean?

1      Q    Okay.  But did you review any documents in

2    preparation for today?

3      A    No.

4      Q    Okay.  There was an investigation by the DOCCS

5    Office of Special Investigation about the incident,

6    correct?

7      A    Yes.

8      Q    All right.  Well, if I refer to the -- to an

9    incident that happened with Plaintiff Carey Smith on

10   September 18, 2015 as "the incident," can we agree that

11   we're talking about the incident with Ms. Smith on

12   September 18, 2015?

13     A    Yes.

14     Q    Got it.  Okay.  And as part of DOCCS's

15   investigation --

16              MR. FU:  And DOCCS, by the way, for the

17   court reporter is D-O-C-C-S.

18   BY MR. FU:

19     Q    -- you had a Q&A with the DOCCS Office of

20   Special Investigation?

21     A    Yes.

22     Q    Okay.  Well -- and if I refer to the New York

23   State Department of Corrections and Community

24   Supervision as "DOCCS," D-O-C-C-S, can we agree that

25   we're talking about the State Department of Corrections?

1   to another jail for them to be released?

2        A    Yeah.  I'm sure we have.  Yes.

3        Q    All right.  I just -- I guess I was just

4   trying to understand like why DOCCS would have you do

5   that.

6        A    Well, because -- just because inmates in our

7   facility doesn't mean he's from that area.  So if he has

8   to be released and he goes back to New York City, well,

9   we got to get him there somehow, or they make other

10  transportation arrangements, so --

11       Q    Okay.  Are there any special preparations that

12  you would take to transport somebody who's being

13  released as opposed to, you know, somebody who's being

14  transported somewhere else?

15       A    Like, we'd have to make sure they -- their

16  records were delivered or their property and -- and

17  such, just stuff like that.

18       Q    On the date of the incident, you transported

19  Ms. Smith to a parole office in Brooklyn, correct?

20       A    Yes, sir.

21       Q    Okay.  Prior to the incident, had you ever

22  been to that parole office before?

23       A    No, sir.

24       Q    Prior to that incident, had you ever

25  transported any prisoner to New York City before?

1       A    I have transported inmates in New York City.

2   Yes.

3       Q    All right.  Prior to the incident, had you

4   ever transported any inmate to a parole office in New

5   York City before?

6       A    No.  No, sir.

7       Q    So directing your attention to the date of the

8   incident, what happened after you arrived at Brooklyn?

9       A    We arrived at Brooklyn.  Sergeant Duda went in

10  and told them we were there.  We parked out front of the

11  -- the building.  Duda -- Sergeant Duda and one of the

12  parole guards came out, and we escorted Inmate Smith

13  into the building.

14      Q    Okay.  And what happened next?

15      A    And then Duda was doing paperwork with the

16  officers.  He instructed me to unhook Inmate Smith.  And

17  I took the restraints off Inmate Smith.

18      Q    And what happened next?

19      A    And then they took Inmate Smith through some

20  doorways, and I never saw him again.  Her.  I mean, on

21  her again.

22      Q    I'd like to show you a document that has been

23  marked as Plaintiff's Exhibit 1.  Mr. Crance, on your

24  end you should be able to scroll through this document,

25  zoom in and out.  I'm going to ask you to review this

```
 1   document to yourself, and let me know when you're

 2   finished.

 3                MS. BAKER:  Can you see it, John?

 4                THE WITNESS:  Barely.

 5                MS. BAKER:  Oh, I'm sorry.  Hang on a

 6   second.  I just lost it.  I'm sorry.  Yeah.  My fault.

 7   I went to make it bigger.  Can you bring it back up

 8   again?  I'm sorry.

 9                MR. FU:  Sure.

10                MS. BAKER:  Oh, here it is.  I got it.  I

11   got it.

12                MR. FU:  Okay.

13                THE WITNESS:  I can -- I can make it out.

14                MS. BAKER:  I actually have a hard copy,

15   too, if we need it.

16                MR. FU:  Yeah.  There's a button to zoom

17   in and out.

18                MS. BAKER:  Yeah.  I did that, and that's

19   -- and that's when I got tossed out of it.

20                THE WITNESS:  Can I scroll up?

21                MS. BAKER:  Yeah.  Just like this.

22                THE WITNESS:  Yes, sir.  It looks like

23   the body receipt for Carey Smith.

24   BY MR. FU:

25       Q    Okay.  So you recognize it to be a document
```

1    called a "body receipt"?

2        A    Yes, sir.

3        Q    And what is a body receipt?

4        A    Body receipt is a piece of paper that we use

5    to put all the information of the inmate search and the

6    property, inmate's property, and everything to keep

7    track that they get their property, and that the strip

8    search there was no contraband found and any other

9    particulars needed for inmates' transportation to and

10    from facilities and their -- their destinations.

11        Q    So a body receipt is part of the paperwork for

12    transporting an inmate out of the facility, right?

13        A    Yes, sir.

14        Q    Yeah.  And transporting an inmate from your

15    custody into somebody else's?

16        A    Yes, sir.

17        Q    I'd like to direct your attention to the

18    bottom third of the page.

19        A    Yes, sir.

20        Q    There's a line there that says -- I believe it

21    says, Name of officer responsible for transportation.

22    Do you see that?

23        A    I believe so.  Yeah.  There's -- there's four

24    signatures on there.  Yes, sir.

25        Q    Is one of those signatures yours?

1        A    Yes, sir.

2        Q    And which one is that?

3        A    The third one.

4        Q    Third one from the left?

5        A    From the left.  Yes, sir.

6        Q    And is this the body receipt related to your

7    transport of Carey Smith from Five Points to the

8    Brooklyn Parole office on September 18, 2015?

9        A    Can you arrow up to the top so I can see the

10   date?  Yes, sir.  It appears to be.

11       Q    And directing your attention back to the

12   bottom of the page, somebody at parole signed this body

13   receipt?

14       A    Yes, sir.  It appears they did.

15       Q    Were you there when they signed this receipt?

16       A    I was in the -- beginning -- yeah.  I was next

17   to the sergeant when he received this paperwork.  Yes,

18   sir.

19       Q    Well, do you remember seeing somebody from

20   parole sign the receipt?

21       A    No, sir.  I don't remember.

22       Q    Okay.  Do you remember if it was a black

23   female parole officer?

24       A    I have no idea, sir.  I have no idea.

25       Q    Okay.  Do you remember if this parole officer

```
 1   recollection as to what happened around the time that

 2   the body receipt was signed?

 3       A    Vaguely I -- I remember that now.  Yes.

 4       Q    Okay.  So what happened?

 5       A    She said, What happened to him?  And I said,

 6   The only thing I can tell you is he fell on the trip and

 7   he vomited.

 8       Q    Okay.

 9       A    That's what I read.

10       Q    So let's -- so let's take this back.

11            At some point a female parole officer

12   approached you, correct?

13       A    Yes, sir.

14       Q    And did you -- did you hand her the body

15   receipt or did somebody else hand her the body receipt?

16       A    It must have been the sergeant.  I wasn't in

17   charge of that.

18       Q    And what happened after this -- after Sergeant

19   Duda handed this female parole officer the body receipt?

20       A    Well, what I read there, apparently.

21       Q    Yeah.  So what happened?

22       A    What I read was that she said, What happened?

23   And I said, I don't know, he must have fell.  I know he

24   fell on the trip.  So I don't see, you know -- whatever

25   I read there, I -- I don't remember.  I -- I don't even
```

1     Q    Was Inmate Smith covered with vomit or

2  anything?

3     A    When -- when I got to the parole office, I

4  noticed a spot on his cuff of his shirt.  And I remember

5  a -- a red mark on his face.  And that was what I looked

6  at when she said that.

7     Q    Okay.  And when did you first notice the spot

8  on the cuff of Inmate Smith's shirt?

9     A    That spot I noticed when we stopped at the

10  rest area on the cuff, a little brown spot.  I thought

11  it was vomit.  I'd asked the inmate what was that on

12  your cuff.  And I don't recall if -- I think he said it

13  was from his nose.

14     Q    And when did you first notice the red mark on

15  Inmate Smith's face?

16     A    I didn't see that until I was un-cuffing him.

17  And that -- and the parole officer said, What happened

18  to him?  That's when I noticed that.

19     Q    And when -- and when in relation to this

20  conversation with the parole officer did you uncuff

21  Inmate Smith?

22     A    When she said that, I was in the process of

23  un-cuffing him.

24     Q    Okay.  Can you describe this red mark?

25     A    It was just a puffy spot under his left eye.

```
 1    Looked like maybe he was sleeping on something.  You

 2    know, when you wake up and there's an impression?

 3    That's what it looked like.

 4         Q    And you said it was red?

 5         A    Yeah.  It was -- it was a red spot, red puffy

 6    spot.

 7         Q    How big was the spot?

 8         A    About the size of a fingernail, I'm -- I'm

 9    guessing the size.  Oh, I'm sorry.  About an inch and a

10    half long by an inch.

11         Q    And was this under the eye, around the eye,

12    somewhere else?

13         A    Just under the eye, on the cheek, I guess.

14         Q    And besides a brown spot that you noticed

15    first at the rest stop and this red mark --

16         A    Yeah.

17         Q    -- did you notice any other unusual things

18    about Ms. Smith's appearance?

19         A    No.  I don't -- I don't remember any.

20         Q    And after you told the correction -- the

21    parole officer that Ms. Smith slipped and vomit and

22    fell, did they say anything?

23         A    I don't recall, sir.

24         Q    Okay.  Well, what happened next?

25         A    We got our equipment, got together, we headed
```

1   restraints?

2        A    Yes, sir.

3        Q    Okay.  At some point on September 18, 2015 you

4   went to Ms. Smith's cell, correct?

5        A    Yes, sir.

6        Q    And she was in 12th block at the time?

7        A    Yes, sir.

8        Q    Besides the restraints, did you carry any

9   other equipment or tools?

10        A    No tools.  We did have to pick up

11   transportation clothes for the inmate.

12        Q    And did you bring the mechanical restraints to

13   Ms. -- did you bring the restraints to Ms. Smith's cell

14   or did somebody else?

15        A    I don't recall.  I'm -- I -- probably on a

16   normal trip I would carry a set of cuffs down with me.

17        Q    Okay.  So you would have a set of cuffs or

18   mechanical restraints?

19        A    Yeah.  From the bag.  Yes, sir.

20        Q    From the bag?

21        A    Yes.  We're not assigned cuffs.  Yeah.

22        Q    So -- okay.  So who would be carrying the bag

23   with the rest of the restraints?

24        A    That's usually Steve.

25        Q    Okay.  And Officer Kennedy was carrying a

1    Department of Corrections, is not to be transported or

2    moved unless they're on camera because of -- probably of

3    allegations made to prove that the allegations are

4    false.

5        Q    At the time of the incident, do you know why

6    Ms. Smith was on a camera order?

7        A    Probably the rumors that I read about that you

8    were -- you showed me earlier.

9        Q    Okay.  Prior to the date of the incident, had

10   you ever transported any other inmate who was on a

11   camera order?

12       A    Maybe.  I did a lot of transports, but I don't

13   recall any particular ones, sir.

14       Q    And is a camera order, to your knowledge, an

15   actual written document somewhere that an inmate needs

16   to have a camera on them at all times?

17       A    I'm sure there's a directive on it.  Yes, sir.

18       Q    Okay.  Well, did you -- did you ever see any

19   camera order for Ms. Smith?

20       A    Not paper.  No.  Maybe on our itinerary.

21       Q    And it would have been just from an itinerary

22   that you would have known that she was on a camera

23   order?

24       A    Yes, sir.

25       Q    What did you see when you arrived at Ms.

1    Smith's cell?

2         A    The -- the front door, a steel door with a

3    window in it.  And the slot was closed that they put

4    their hands or trays through.  A window that was covered

5    in feces.  And I could see in the window and see Inmate

6    Smith standing inside the cell.

7         Q    Was she wearing anything?

8         A    She had a green smock on that they give

9    inmates that hurt themselves.  Medical smock.

10        Q    Okay.  And at some point you approached her

11   cell, right?

12        A    Yes, sir.

13        Q    And what happened next?

14        A    Sergeant identified the inmate and told the

15   inmate that he was or she was going on a transport.

16        Q    Did she say anything at this point?

17        A    I don't recall what -- she was saying

18   something.  I don't recall exactly what it was.

19        Q    Did you say anything to her?

20        A    I don't believe I did.

21        Q    How does -- how would the sergeant have

22   identified her?

23        A    He would have had her ID.  And he would have

24   had the inmate give his name and DIN number.  And he

25   would have had a picture on the ID of the inmate.  And

1   there's also pictures that go with the trip of the

2   inmate.

3        Q    Okay.  And at some point Ms. Smith got out of

4   her cell, right?

5        A    Yes, sir.  I put her --

6        Q    Yes.  So just -- yeah.

7        A    Yeah.

8        Q    Describe that process.

9        A    The sergeant gave her instructions to put her

10  hands out the slot.  And I put the -- she backed up.

11  Put her hands behind her.  Through the slot, I applied

12  mechanical restraints to her wrists.  And then she steps

13  in.  And they open the door.  And then I put my hand on

14  the cuffs.  And I escort the inmate down the corridor to

15  the strip-frisk room.

16       Q    And describe how you put her -- put your hand

17  on her cuffs.

18       A    Usually it's my left hand.  I grab the cuffs

19  in the center where the chain is.  And I hold the cuffs

20  as we walk down the corridor.

21       Q    So generally speaking, about how far are you

22  from the prisoner when you're escorting them within the

23  facility?

24       A    No.  I'm close enough to have my hand on the

25  cuff, so within six inches to a foot.  And I hold the

1    cuffs.  And I walk approximately a step behind the

2    inmate down the corridor.

3        Q    And why do you hold the cuffs?

4        A    In case the inmate wants to do anything, I

5    have control.

6        Q    Yeah.  It's a technique taught by DOCCS?

7        A    Yes, sir.

8        Q    Okay.  And you're taught that you -- as the

9    inmate handler, you have to be in control of the

10   situation, correct?

11       A    Yes, sir.

12       Q    When you arrived at Ms. Smith's cell, did you

13   notice anything unusual?

14       A    There was a strong smell of feces.  And you

15   could see feces on the glass in the cell.

16       Q    Did you notice any injuries to her?

17       A    No, sir.

18       Q    There were no injuries on her at that point,

19   correct?

20       A    No, sir.  I didn't see any.

21       Q    While you were at Ms. Smith's cell, did you

22   say anything to her?

23       A    I -- I may have.  I don't recall anything I

24   said.

25       Q    Okay.  Besides Ms. Smith, did anybody --

1    sorry.  Withdrawn.

2              Besides the sergeant, did anybody else say

3    anything to Ms. Smith?

4         A    I don't recall, sir.

5         Q    Okay.  Besides the mechanical restraints, were

6    any other restraints placed on Ms. Smith while she was

7    at her cell?

8         A    Not at this time.  No, sir.

9         Q    Okay.  And why is that?

10        A    Because she needs to walk, so we don't put leg

11   irons because they got to walk such a distance to the

12   strip-frisk room.  And then there's another great

13   distance back up to the infirmary where we exit the

14   facility.

15        Q    What about the waist chain?

16        A    That's applied later after the strip frisk and

17   they're ready to be loaded into the van.

18        Q    And as Ms. Smith was being taken out of her

19   cell, you saw the front of her, right?

20        A    Yes, sir.  She was standing right --

21        Q    And you saw her face?

22        A    Yes, sir.

23        Q    I'm sorry.  I cut you off.

24        A    No.  She was standing right there in front of

25   the glass talking to sergeant.  I could see her face.

1    Q    Yeah.  And from the -- from the -- from her

2  cell, you took her to the strip-frisk room?

3    A    Yes, sir.

4    Q    And up to this point was Ms. Smith compliant

5  with all of your orders?

6    A    Yes, sir.

7    Q    And she was compliant with all of any other

8  officer's orders?

9    A    Yes, sir.

10    Q    Okay.  The strip-frisk room, is that -- where

11  is that in relation to Ms. Smith's cell?

12    A    It's just outside of the front door, the 12

13  Block.

14    Q    And how far is that?

15    A    Yeah.  It's approximately, I want to say, 50

16  to 100 yards from her cell.

17    Q    Is there a strip-frisk room for every housing

18  block at Five Points?

19    A    No.  I don't believe so.  Well, yes.  There --

20  I think there is because they're set up a little

21  different than 12 Block.  I think there's a strip-frisk

22  room inside every block, now that you say that, sir, if

23  I remember correctly.

24    Q    Can you describe the strip-frisk room that Ms.

25  Smith was taken to?

1      A    Apparently, we put them in full restraints.

2      Q    Okay.  But after the strip-frisk room Ms.

3  Smith wasn't placed in full restraints, correct?

4      A    Correct, sir.

5      Q    Why not?

6      A    Well, it's probably due to the fact she had to

7  walk 200 yards up to the infirmary.  So we probably just

8  put her in cuffs to escort her, sir.

9      Q    And after the strip-frisk room, you took Ms.

10  Smith to the infirmary, correct?

11      A    Yes, sir.

12      Q    Okay.  Up to this point, was she complying

13  with all of your orders?

14      A    Yes, sir.

15      Q    Up to this point, was she compliant with all

16  the other officers' orders?

17      A    Yes, sir.

18      Q    Did you notice any injuries at all at this

19  point?

20      A    No, sir.

21      Q    Okay.  During the walk from the strip-frisk

22  room to the infirmary, how was everybody positioned?

23      A    I escorted the inmate, like I had told you

24  before, holding the cuffs in the center.  One step

25  behind.  The sergeant would have -- and Kennedy --

1    sergeant that the inmate was there.  And she reported

2    over there and talked to the inmate.

3        Q    Okay.  Would there have been any paperwork

4    related to this interaction between the nurse and Ms.

5    Smith?

6        A    Not on our end.  The nurse might have some.  I

7    -- we didn't have any.

8        Q    To the best of your recollection, was there

9    anything unusual about this interaction between the

10   nurse and Ms. Smith?

11       A    No, sir.

12       Q    Did Ms. Smith say anything about being injured

13   in any way?

14       A    No, sir.

15       Q    Okay.  Okay.  And what -- how long would the

16   nurse have been with Ms. Smith?

17       A    A couple of minutes.

18       Q    Okay.  And what happened next?

19       A    We shut the door.  Kennedy set the camera up

20   on the ledge of the window, facing in the cell.  And the

21   inmate -- I -- I took the restraints off.  Put her in

22   the cell.  And she stayed in there.  And I stayed there

23   to watch while the sergeant went to get the medical

24   records and property set up.  And, yeah, that's -- yeah.

25       Q    Well, at some point Ms. Smith took a shower,

```
 1    correct?

 2         A    Yes.

 3         Q    So when was that in relation to what you're

 4    telling me -- to what you were just telling me?

 5         A    Once we put her in the cell, she took a

 6    shower.

 7         Q    Okay.  Do you remember what room in the -- in

 8    the infirmary you took her to?

 9         A    I do not remember the number or anything.

10         Q    What -- were the rooms numbered?

11         A    There are numbers on them.  Yes, sir.

12         Q    Okay.  Does Room 2 ring a bell?

13         A    Not really, but probably was.  Yeah.

14         Q    Okay.  Room 2 is at the end of a hallway?

15         A    I don't -- I don't remember, sir.  It was

16    right in -- the cell was right in the middle of two

17    other cells, I believe.

18         Q    So how did it come to be that Ms. Smith took a

19    shower?

20         A    Oh, she smelled like feces, and she requested

21    a shower.

22         Q    Okay.  Where was she when she requested a

23    shower?

24         A    In the cell.

25         Q    Okay.  So she first requested a shower after
```